PUBLISH

UNITED STATES COURT OF APPEALS

Filed 5/3/96                    TENCH CIRCUIT

---

HAROLDS STORES, INC.; CMT ENTERPRISES, INC., )
)
)
Plaintiffs-Appellees, )
)
v. ) No. 95-6133
)
DILLARD DEPARTMENT STORES, INC., )
)
Defendant-Appellant. )

-----------------------------------

HAROLDS STORES, INC., )
)
Plaintiff-Cross-Appellant, )
)
v. ) No. 95-6160
)
DILLARD DEPARTMENT STORES, INC., )
)
Defendant-Cross-Appellee. )

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CV-93-1212-R)

---

D. Kent Meyers, (Mack J. Morgan III and Joseph J. Ferretti with him on the brief), Crowe & Dunlevy, Oklahoma City, Oklahoma, for Plaintiffs-Appellees/Cross-Appellant.

Terry W. Tippens, (Thomas J. Enis, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Oklahoma, Simor L. Moskowitz, Jacobson, Price, Holman & Stern, Washington, D.C., with him on the brief), Fellers, Snider, Blankenship, Bailey &

Tippens, Oklahoma City, Oklahoma, for Defendant-Appellant/Cross-Appellee.

Before ANDERSON, TACHA, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

This appeal arises from a jury verdict entered in a copyright infringement action. Plaintiffs Harold's Stores, Inc. ("Harold's") and CMT Enterprises, Inc. ("CMT") filed suit against Defendant Dillard Department Stores, Inc. ("Dillard")[1] alleging that Dillard infringed Harold's copyrighted fabric designs contained on women's garments, predominately skirts. Harold's also asserted that Dillard violated the Oklahoma Antitrust Act and the Oklahoma Unfair Sales Act. A jury returned a verdict for Harold's on all three claims. Dillard appeals, arguing that federal copyright law preempted Harold's state antitrust claim, the district court erroneously admitted consumer survey evidence, and that it was entitled to judgment as a matter of law after trial. Harold's cross-appeals the district court's rulings on its motions for attorneys' fees and denial of its motion for a permanent injunction.

---

[1] Harold's Stores, Inc. and CMT Enterprises, Inc. jointly filed copyright infringement claims against Dillard. Harold's Stores, Inc. alone, however, asserted claims against Dillard under the Oklahoma Antitrust Act and the Oklahoma Unfair Sales Act. Thus, references in this opinion to "Harold's" regarding the copyright infringement claims include CMT Enterprises, Inc., while references to "Harold's" in relation to the Oklahoma state law claims do not.

## I.

### A.

Dillard is a retail department store, operating 218 stores in 17 states. Harold's is a retail clothing store with 22 stores in 7 states, including 6 in Oklahoma and 7 in Texas. Women's clothing forms the majority of Harold's business. With the assistance of CMT, a garment manufacturer, Harold's designs and manufactures private label women's clothing, including skirts, that feature original print fabric designs. Harold's annually develops 70 to 80 print fabrics from original art that it purchases from art studios in Italy and New York. Garments made from the original print fabrics comprise 56% of Harold's skirt sales, and 40% of Harold's overall sportswear sales. Harold's represents to its customers that the original print fabric garments are available solely from Harold's. In sum, Harold's offers unique custom-printed fabric designs in skirts and other sportswear that are not available from Harold's competitors, including Dillard.

### B.

On May 10, 1993, Rebecca Casey, C.E.O. of Harold's, received information that Dillard stores in Norman and Tulsa, Oklahoma were offering for sale skirts with print fabric patterns identical to print skirts that Harold's had sold during the previous 1991 to 1992 sales season. Ms. Casey dispatched two employees to a Dillard store to investigate. The employees returned with "sacks of garments" purchased at Dillard that upon first examination appeared identical to print skirts that Harold's had developed from original

3

art and offered for sale at $78.00 to $80.00 apiece the year before. The Dillard skirts were priced at $28.00 to $30.00. Over the next few days, Harold's personnel discovered skirts substantially similar to Harold's own offered for sale in 26 different Dillard stores.

On May 12, 1993, Harold's sent a demand letter to Dillard claiming that Dillard had infringed Harold's copyrighted print fabrics and requesting Dillard to remove the merchandise from its stores. Dillard did not remove the garments at issue from its stores.

C.

Harold's filed its original complaint on July 8, 1993, claiming violations of the Copyright Act, the Oklahoma Antitrust Act, and the Oklahoma Unfair Sales Act. Harold's sought preliminary and permanent injunctive relief and damages. On July 21, 1993 Dillard reduced the price of the skirts from $28.00 or $30.00 to $12.00 or $12.25, a 59% mark down that set the price below cost. During discovery, Harold's learned that Dillard buyers had arranged for the manufacture of the print skirts at issue from two separate sources: Cannontex and Wadesboro Manufacturing Company. Two different Dillard merchandise managers instructed Cannontex to manufacture skirts using Harold's skirts as "inspiration."[2] One of the merchandise managers purchased skirts from Harold's so that Cannontex could copy the print fabric designs and styles. The skirts obtained

---

[2] Designers in the fashion industry commonly use other manufacturer's garments for inspiration in the product development process. Industry practice, however, requires that derivative designs vary from the patterns used for inspiration to avoid copyright infringement. Aplt. App. at 1752, 1820, 2234-35.

from Wadesboro were made from fabric similar or identical to fabric used by CMT to manufacture skirts for Harold's. On August 17, 1993, prior to a hearing on Harold's motion for a preliminary induction, Dillard agreed that it would not sell the print skirts in markets where Harold's and Dillard competed, but that Dillard could sell the garments in markets where Harold's did not have stores.

Dillard and Harold's hotly contested the pretrial litigation, and Dillard filed at least six motions for partial summary judgment, a motion to dismiss, and several motions to reconsider. As relevant to this appeal, Dillard moved for partial summary judgment on the grounds that § 301 of the Copyright Act preempted Harold's claim under the Oklahoma Antitrust Act, Okla. Stat. tit. 79, § 1. The district court denied Dillard's motion for partial summary judgment, ruling that the Copyright Act did not preempt Harold's claim under the Oklahoma Antitrust Act because the state law claim was qualitatively different from, and not subsumed by a federal claim for copyright infringement.

Prior to trial, Dillard stipulated that it had infringed 19 of Harold's copyrighted print fabrics. Dillard offered for sale a total of 22,000 garments manufactured using Harold's copyrighted print fabric designs, and placed advance orders for 15,000 more. Thus, Dillard offered for sale or had ordered a total of 37,000 garments which infringed Harold's copyrights.

The district court conducted a six-day jury trial on Harold's damages claims. To

establish its damages, Harold's submitted opinion testimony from Dr. Donald Murry and Dr. Daniel Howard. Dr. Murry, an economics professor from the University of Oklahoma, testified that Dillard's infringement of Harold's copyrights and offering skirts for sale below cost in violation of the Oklahoma Unfair Sales Act amounted to unreasonable acts in restraint of trade under the Oklahoma Antitrust Act.

Dr. Howard, a marketing professor from Southern Methodist University ("SMU"), estimated Harold's damages. Based on the results of a survey of college-aged women who had visited a Harold's store or examined a Harold's catalog and visited a Dillard store during the relevant time, Dr. Howard calculated the damages Harold's suffered nationwide due to Dillard's infringement of Harold's copyrights, and the damages Harold's suffered in Oklahoma on the Oklahoma Antitrust Act and Oklahoma Unfair Sales Act claims. Over Dillard's motion in limine and objections, the district court admitted Dr. Howard's survey, report, and testimony.

At the close of evidence, the district court denied Dillard's motion for judgment as a matter of law. The jury returned a verdict in favor of Harold's on all three claims on May 16, 1994. The jury awarded Harold's and CMT $312,000.00 jointly as actual damages on the copyright infringement claim, and awarded Harold's individually $21,780.00 on the Oklahoma Unfair Sales Act claim and $30,000.00 on the Oklahoma Antitrust Act claim. The district court entered the judgment on the docket on May 17, 1994, but did not address Harold's remaining claim for a permanent injunction. Later, the

6

district court amended the judgment and reduced the copyright damages to $260,220.00 to eliminate double recovery, and trebled the antitrust damage award to $90,000.00, for a total judgment of $372,000.00.

Dillard filed a renewal motion for judgment as a matter of law after trial which the district court denied on September 2, 1994. On August 31, 1994 the district court denied Harold's motion under Fed. R. Civ. P. 37 for attorneys' fees and expenses incurred in proving that William Dillard made certain statements reported in the Dallas Morning News that Dillard had denied Mr. Dillard made during discovery. On September 30, 1994, Harold's filed an untimely motion to amend the judgment under Fed. R. Civ. P. 59(e) and requested a permanent injunction. The district court denied Harold's request for a permanent injunction on February 14, 1995 and awarded Harold's $30,000.00 in attorneys' fees on its Oklahoma Antitrust Act claim.

D.

Both parties appealed. Dillard contends the district court erred by: (1) concluding that § 301 of the Copyright Act did not preempt Harold's Oklahoma Antitrust Act claim; (2) admitting Dr. Howard's survey; and (3) denying its renewal motion for judgment as a

matter of law after trial.[3]  Harold's argues the district court erred by: (1) failing to award

Harold's reasonable attorneys' fees on its Oklahoma Antitrust Act claim; (2) failing to

award Harold's attorneys' fees and expenses incurred under Fed. R. Civ. P. 37 in proving

that William Dillard made certain statements reported in a newspaper that Dillard denied

<hr>

[3]      Dillard also contends the district court erred because "Harold's copyright damage claims based on its unrecovered and Dillard's avoided development costs lack foundation."  Aplt. Br. at 28.  We decline to address this argument, however, because Dillard failed to identify in its opening brief where it raised this argument before the district court.  In this circuit, litigants are required to identify "in their initial briefs . . . with respect to each issue raised on appeal, a statement as to where in the record the issue was raised and ruled upon."  10th Cir. R. 28.2(b); see also 10th Cir. R. 28.2(c) (Whenever an "appeal is based upon a failure to admit or exclude evidence, or the giving or refusal to give a particular jury instruction, or any other act or ruling for which a party must record an objection to preserve the right to appeal, [the party must include in the initial brief] a statement as to where a proper objection and the court's ruling thereon may be found in the record.").  We may refuse to review alleged error if the party seeking review fails "to include and reference the portion of the record wherein their objection and the district court's ruling thereon may be found."  Jetcraft Corp. v. Flight Safety Int'l, 16 F.3d 362, 366 (10th Cir. 1993).

The record on appeal in this case constitutes eight volumes.  We decline to sift through over 2500 pages of information, including the transcript of a six-day jury trial, six partial motions for summary judgment, and several motions for reconsideration to find support for Dillard's argument.  See Securities and Exch. Comm'n v. Thomas, 965 F.2d 825, 827 (10th Cir. 1992) (appellant bears burden to provide court with essential references to record to carry its burden of proving error); Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1513-14 (10th Cir. 1990) (where record is voluminous, it is imperative that appellant provide specific references to record).  Thus, we do not consider Dillard's argument on this issue.

Finally, we note that Dillard failed to specifically identify where in the record the majority of issues presented in its opening brief were raised and ruled upon.  Given the numerous dispositive motions filed during the pendency of this litigation in the district court, Dillard's failure to abide by the requirements of 10th Cir. R. 28.2(b), (c) greatly complicated our resolution of this appeal.  We admonish Dillard that it risks summary dismissal of its appeal when it fails to provide this court with specific citations to the record in support of each allegation of reversible error.

in discovery; and (3) denying Harold's motion for a permanent injunction.

## II.

As an initial matter, we must examine our jurisdiction over this appeal. Dillard filed its notice of appeal on March 16, 1995, 30 days after the February 14, 1995 order denying Harold's request for a permanent injunction, but 190 days after the district court denied Dillard's renewal motion for judgment as a matter of law on September 2, 1994. Harold's filed a notice of its cross-appeal on March 29, 1995, within fourteen days of Dillard's March 16, 1995 notice of appeal pursuant to Fed. R. App. P. 4(a)(3).

On May 3, 1995, Harold's filed a motion to dismiss Dillard's appeal, (as well as Harold's subsequent cross-appeal), for lack of jurisdiction. According to Harold's, we lack jurisdiction to entertain these appeals because Dillard failed to file its notice of appeal within 30 days of the district court's September 2, 1994 order denying Dillard's renewal motion for judgment as a matter of law as required by Fed. R. App. P. 4(a)(4). Harold's contends that Dillard's notice of appeal--filed 190 days after the September 2, 1994 order--was fully 160 days out of time, and hence ineffective to confer appellate jurisdiction.

Dillard asserts that the March 16, 1995 notice of appeal was timely because the district court's September 2, 1994 order denying the renewal motion for judgment as a matter of law did not constitute a final decision within the meaning of 28 U.S.C. § 1291. Dillard argues that the September 2, 1994 order (and the underlying May 17, 1994

9

judgment) did not become final until the district court disposed of Harold's remaining claim for a permanent injunction on February 14, 1995. Consequently, Dillard maintains that it timely filed its notice of appeal on March 16, 1995 within the 30 day period prescribed by Fed. R. App. P. 4(a).

We may address the merits of a lawsuit only if it satisfies the requirements for appellate jurisdiction set forth in 28 U.S.C. § 1291. E.g., Albright v. UNUM Life Ins. Co. of America, 59 F.3d 1089, 1092 (10th Cir. 1995). Section 1291 grants jurisdiction to the courts of appeals to review "all final decisions of the district courts of the United States." A final decision is one that fully resolves all claims for relief. E.g., Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 744 (1976). Orders that leave the "assessment of damages or awarding of other relief . . . to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291." Id. (emphasis added); see also Catlin v. United States, 324 U.S. 229, 233 (1945) (A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."); Albright, 59 F.3d at 1092. Under Fed. R. Civ. P. 54(b), "any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties" for purposes of appeal. See id. An order that adjudicates fewer than all the claims raised is not a final, appealable decision unless the district court certifies it under Rule 54(b). Id.; Atiya v. Salt Lake County, 988 F.2d 1013, 1016 (10th Cir. 1993). Thus, a district

10

court order that resolves claims for damages presented to a jury at trial but fails to dispose of a claim for injunctive relief before the district court does not constitute an appealable final decision within the meaning of 28 U.S.C. § 1291.  See Palmetto State Medical Center, Inc. v. Operation Rescue, No. 90-2688, 1994 WL 468123, at **2 (4th Cir. August 31, 1994) (ruling that a directed verdict entered on claims presented to a jury was not a final appealable order under § 1291 where court failed to resolve remaining claim for injunctive relief) (unpublished).

In the instant case, Harold's third amended complaint sought a permanent injunction and damages.  At trial the jury only considered Dillard's claims for damages. Neither the May 17, 1994 judgment entered on the jury verdict, nor the district court's September 2, 1994 order resolved Harold's claim for a permanent injunction. Consequently, Harold's claim for a permanent injunction remained outstanding after September 2, 1994.  The district court did not resolve Harold's claim for a permanent injunction until February 14, 1995 when it entered the order denying Harold's motion to amend the judgment to provide for a permanent injunction.  Simply put, the September 2, 1994 order denying Dillard's renewal motion for judgment as a matter of  law did not become an appealable final decision under 28 U.S.C. § 1291 until the district court denied Harold's claim for a permanent injunction on February 14, 1995.  E.g., Liberty Mutual Ins. Co., 424 U.S. at 744; Atiya, 988 F.2d at 1016; Palmetto, 1994 WL 468123 at **2. Thus, the thirty-day period prescribed by Fed. R. App. P. 4(a)(1), (4) for Dillard to file its

11

notice of appeal began to run on February 14, 1995. Dillard filed its notice of appeal on March 16, 1995, thirty days later. Consequently, we have jurisdiction over these appeals under 28 U.S.C. § 1291. We therefore deny Harold's motion to dismiss the appeals for lack of jurisdiction.

III.

Turning to the merits, Dillard first contends the district court erred by concluding that § 301 of the Copyright Act did not preempt Harold's Oklahoma Antitrust Act claim. Dillard argues that § 301 preempted the Oklahoma Antitrust Act claim because Harold's state antitrust claim relied on the same activities and predicate acts as did the federal copyright claim, i.e., copyright infringement. Consequently, Dillard maintains the district court erred in denying its motion for partial summary judgment based on federal copyright preemption of Harold's state antitrust claim.

We review the district court's ruling on summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Ball v. Renner, 54 F.3d 664, 665 (10th Cir. 1995). Summary judgment is appropriate only if there are no genuinely disputed material issues of fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Whether § 301 of the Copyright Act preempts a state law claim presents a question of law that we review de novo on appeal. Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 658 (4th Cir.), cert. denied, 114 S. Ct. 443 (1993).

Section 301 of the Copyright Act preempts enforcement of any state cause of action which is equivalent in substance to a federal copyright infringement claim.[4] More specifically, § 301 preempts a state common law or statutory claim if: "(1) the work is within the scope of the subject matter of copyright as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir. 1993) (quotations and citations omitted); accord Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147,

---

[4] Section 301(a) provides:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis added). Section 301(b) limits § 301(a), and provides in relevant part:

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to--
(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103 . . . or
. . . .
(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301(b).

13

1164 (1st Cir. 1994); Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 229 (4th Cir. 1993).

Harold's does not dispute that the print fabrics at issue fall within the "subject matter of copyright as specified in 17 U.S.C. §§ 102 and 103." Thus, we must determine whether the rights granted by the Oklahoma Antitrust Act, Okla. Stat. tit. 79, § 1, the legal basis of Harold's state antitrust claim, are equivalent to any of the exclusive rights granted by § 106 of the Copyright Act. See Gates Rubber Co., 9 F.3d at 847. Section 106 of the Copyright Act grants to the copyright owner the exclusive rights to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work; (4) perform the work publicly; and (5) display the work publicly. 17 U.S.C. § 106. "Section 301 preempts only those state law rights that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law." Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992) (quotations omitted).

Harold's based its Oklahoma Antitrust Act claim on Dillard's copyright infringement of the print fabric skirts and sportswear. Specifically, Harold's alleged in its third amended complaint that Dillard's copyright infringement constituted an act in restraint of trade in violation of the Oklahoma Antitrust Act, Okla. Stat. tit. 79, § 1. Because Harold's Oklahoma Antitrust Act claim was premised on the same conduct as the copyright infringement claim, Dillard asserts that § 301 of Copyright Act preempts

14

Harold's state law antitrust claim. Dillard, however, "takes the wrong approach by focusing its preemption analysis on the conduct alleged to support the two causes of action." Trandes Corp., 996 F.2d at 659. In order to determine whether Harold's Oklahoma Antitrust Act claim asserts rights equivalent to those specified in § 106 of the Copyright Act--and is thereby preempted by § 301--we compare the elements of the causes of action, not the facts pled to prove them. Gates Rubber Co., 9 F.3d at 847; Rosciszewski, 1 F.3d at 229; Trandes Corp., 996 F.2d at 659. "[I]f a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action." Gates Rubber Co., 9 F.3d at 847 (citing Computer Assocs. Int'l, 982 F.2d at 716); see also Rosciszewski, 1 F.3d at 229-30 (noting that "the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim") (quotations and citations omitted). Hence, to correctly analyze Dillard's copyright preemption argument using the "extra element" test, we must compare the elements of a claim for copyright infringement to the elements of a claim for an Oklahoma Antitrust violation.

To prove copyright infringement under the Copyright Act, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv., Co., 499 U.S. 340, 361

(1991). To prove a violation of the Oklahoma Antitrust Act, a plaintiff must establish

that the defendant committed: (1) an act, (2) in restraint of trade. Okla. Stat. tit. 79, § 1;[5]

see generally Board of Regents of the Univ. of Okla. v. National Collegiate Athletic

Ass'n, 561 P.2d 499, 505-06 (Okla. 1977) (discussing Oklahoma Antitrust Act). An act

restrains trade under Okla. Stat. tit. 79, § 1 if it "prejudice[s] public interests by unduly

restricting competition, or unduly obstruct[s] the due course of trade, or . . . injuriously

restrain[s] trade." Crown Paint Co. v. Bankston, 640 P.2d 948, 950 (Okla. 1981), cert.

denied, 455 U.S. 946 (1982).

Applying these principles to the instant case, the elements of an Oklahoma

Antitrust Act claim require Harold's to prove that Dillard's: (1) infringed Harold's

copyrights in violation of the Copyright Act, (2) in restraint of trade. Okla. Stat. tit. 79,

§ 1. To satisfy the restraint of trade element, Harold's must demonstrate that Dillard's

copyright infringement "prejudice[d] public interests by unduly restricting competition, or

unduly obstruct[ed] the due course of trade, or . . . injuriously restrain[ed] trade." Crown

Paint Co., 640 P.2d at 950. The "restraint of trade" element of Okla. Stat. tit. 79, § 1

supplies the "extra element" that qualitatively distinguishes an Oklahoma Antitrust Act

---

[5]    The Oklahoma Antitrust Act provides in relevant part:
**§ 1. Trust in restraint of trade illegal**
       Every act, agreement, contract, or combination in the form of trust,
or otherwise, or conspiracy in restraint of trade or commerce within this
state is hereby declared to be against public policy and illegal.
Okla. Stat. tit. 79, § 1.

claim from a claim for copyright infringement under the Copyright Act. That is, the restraint of trade component of an Oklahoma Antitrust Act claim requires a litigant claiming a violation of Okla. Stat. tit. 79, § 1 to establish proof beyond that required to demonstrate a violation of the exclusive rights protected by § 106 of the Copyright Act, i.e., copying, preparation of derivative works, performance, distribution or display. See Gates Rubber Co., 9 F.3d at 847; Rosciszewski, 1 F.3d at 229-30. Because Harold's Oklahoma Antitrust Act claim requires proof of an extra element separate from that required for Harold's copyright infringement claim, we hold that § 301 of the Copyright Act does not preempt the Oklahoma Antitrust Act, Okla. Stat. tit. 79, § 1. Consequently, the district court did not err in denying Dillard's motion for partial summary judgment based on federal copyright preemption of Harold's Oklahoma Antitrust Act claim.

IV.

Next, Dillard contends the district erred in admitting Dr. Howard's survey. Dillard argues the district court abused its discretion in admitting the survey because: (1) Dr. Howard failed to survey a relevant universe of consumers, and (2) the survey was not material or probative to establish copyright damages.

We allow the admission of survey evidence "as an exception to the hearsay rule if the survey is material, more probative on the issue than other evidence and if it has guarantees of trustworthiness." Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 522 (10th Cir. 1987) (citing Fed. R. Evid. 803(24)); see also 5 Jack B. Weinstein & Margaret

17

A. Berger, Weinstein's Evidence ¶ 901(b)(9)[03] at 901-140 (1995) ("The admissibility of survey or sampling results depends upon two factors: necessity and trustworthiness."); Manual for Complex Litigation, Third, § 21.493 at 101 (1995) ("In some cases, sampling techniques may provide the only practicable means to collect and present relevant data."). "A survey is trustworthy if it is shown to have been conducted according to generally accepted survey principles." Brunswick Corp., 832 F.2d at 522; accord Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988), cert. denied sub nom., 493 U.S. 813 (1989).

The survey should sample an adequate or proper universe of respondents. Exxon Corp. v. Texas Motor Exchange of Houston, Inc., 628 F.2d 500, 507 (5th Cir. 1980). "[T]hat is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir.), cert. denied, 449 U.S. 899 (1980). The district court should exclude the survey "when the sample is clearly not representative of the universe it is intended to reflect." Bank of Utah v. Commercial Sec. Bank, 369 F.2d 19, 27 (10th Cir. 1966), cert. denied, 386 U.S. 1018 (1967). Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility. Brunswick, 832 F.2d at 523 & n.6; Keith, 858 F.2d at 480; Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 844-45 & n.24 (11th Cir. 1983). We review the district court's admission of a survey for an abuse of discretion. Brunswick, 832 F.2d at 522.

18

At trial, Harold's claimed that Dillard's sale in 1993 of copyrighted skirts that Harold's sold in 1991 and 1992 injured Harold's reputation and goodwill, and damaged Harold's relations and future sales with present and prospective customers.[6] Harold's retained Dr. Howard to offer opinion testimony in support of Harold's damages claims. As a basis for his testimony, Dr. Howard surveyed 1,231 female undergraduates at SMU in October 1993 using a single-page survey. The complete survey is set forth in the

---

[6] Harold's stipulated that Dillard's sale of the infringing garments did not deprive Harold's of any sales of the copyrighted print fabric skirts. Harold's sold the print fabric skirts infringed by Dillard only in 1991 and 1992; Dillard did not offer the infringing garments for sale until 1993. Aplt. App. at 1083.

margin.[7]  578 of the 1,231 respondents reported that they had visited a Harold's store or looked at a Harold's catalog and visited a Dillard store during the relevant time periods. Dr. Howard used the universe of female undergraduates who were exposed to both Harold's and Dillard during the times at issue to "determine whether, and to what degree, Dillard's sale of Harold's copyrighted fabric designs inflicted damages to future sales of women's and men's clothing by Harold's."  Aplee. Supp. App. at 2441, 2472.

Dillard maintains the district court abused its discretion in admitting the survey because the group surveyed was too narrow.  Dillard argues that because Dr. Howard

---

[7]                                 Shopping Survey
Instructions: Please respond to the following questions by placing a "x" in the space that most closely reflects your memories and your feelings about the issues addressed.

(1)    Have you visited a Harold's store or looked at a Harold's catalog in the past two
       years (in 1991 or 1992)?
       ___yes ___no ___unsure
(2)    Did you visit a Dillard's department store from May to August of this year (1993)?
       ___yes ___no ___unsure
CONTINUE THE SURVEY ONLY IF YOU ANSWERED "YES" TO #1 AND #2
(3)    On any of your recent visits to Dillard's, have you seen any print skirts with
       patterns you thought of as being unique to Harold's?
       ___yes ___no ___unsure
(4)    On any of your recent visits to Dillard's, have you seen any women's purses with
       designs you thought of as being unique to Harold's?
       ___yes ___no ___unsure
(5)    How likely or unlikely is it that you will purchase clothes from Harold's within the
       next year?
       very likely ___:___:___:___:___:___:___ very unlikely
(6)    Is this the first time you have answered these questions?
       ___yes ___no ___unsure

Aplee. Supp. App. at 2496.

20

surveyed only female undergraduates at SMU, and from their responses extrapolated damages for all consumers that potentially would shop at a Harold's store, the survey was fatally flawed. According to Dillard, the proper universe encompasses "Harold's overall customers." Aplt. Reply Br. at 21.

On this record, we cannot conclude the district court abused its discretion in admitting the survey. The district court conducted an extensive voir dire of Dr. Howard and satisfied itself that the survey was material, probative to the issue of copyright infringement damages, and conducted according to generally accepted survey principles. Aplt. App. at 1913-34. The record also reflects that Harold's laid an adequate foundation to admit the survey. Dr. Howard testified that he conducted the survey according to generally accepted survey principles. Aplt. App. at 1941-60. See Keith, 858 F.2d at 481 ("The testimony of the survey director alone is sufficient to establish a foundation.").

We also conclude that Dr. Howard surveyed an adequate universe of respondents. Ms. Casey, CEO of Harold's, testified that college-aged women represent a critically important group to Harold's overall sales. Ms. Casey also testified that Harold's first store was located on a college campus and that Harold's intentionally locates its stores near college campuses to target the college market, primarily undergraduate women. Ms. Casey observed that in her view, the buying patterns of college-age women are "identical to our older customers." Aplt. App. at 1676. Testimony before the district court also established that purchasing patterns, consumer preferences, and the demand for Harold's

21

products were similar for all Harold's stores, regardless of geographic location. Aplt. App. at 1953.

Because testimony before the district court established that college-age women comprise Harold's core customer base, this survey does not amount to an instance "when the sample is clearly not representative of the universe it is intended to reflect." Bank of Utah, 369 F.2d at 27. Instead, the record demonstrates that the universe of college-age women who had visited a Dillard store and either visited a Harold's store or looked at a Harold's catalog during the relevant time periods "represent the opinions which are relevant to the litigation." Amstar, 615 F.2d at 264. That is, the survey respondents' opinions are probative on the issue of whether and to what degree Dillard's infringement and sale of Harold's copyrighted fabric designs damaged Harold's future clothing sales.[8] Thus, Dillard's contention that the survey was not probative or material to the issue of copyright infringement damages fails.

In sum, we hold the district court did not abuse its discretion in admitting the

---

[8]        See also Brunswick, 832 F.2d at 523 n.6 (holding that universe of persons over 14 years old who had fished in freshwater during previous 12 months sampled persons likely to purchase fishing reels and was therefore probative of likelihood of confusion in trademark infringement action between two fishing reel manufacturers); Jellibeans, 716 F.2d at 845 n.24 (ruling that universe of persons between ages 12 and 24 who had roller-skated in the last year was adequate survey sample and probative of actual confusion in deceptive trade practice action between two roller rink operators); Amstar Corp., 615 F.2d at 264 (ruling that universe of women found at home during daylight hours was inadequate survey universe in trademark infringement action by maker of Domino Sugar against Domino's Pizza because the survey "neglected completely defendants' primary customers--young, single, male college students").

survey because Dr. Howard surveyed an adequate universe of respondents according to generally accepted survey principles. Consequently, any technical or methodological deficiencies in the manner in which Dr. Howard conducted the survey bear on the weight--not the admissibility--of the survey.[9] E.g., Brunswick, 832 F.2d at 523 & n.6. We therefore reject Dillard's argument that the district court erred in admitting the survey because the survey respondents did not encompass "Harold's overall customers" and because the survey was, according to Dillard, not material or probative.

V.

Next, Dillard contends the district court erred in denying its Fed. R. Civ. P. 50(b) renewal motion for judgment as a matter of law after trial. Dillard argues it was entitled to judgment as a matter of law because: (1) the evidence was insufficient to support the copyright damages award; (2) Harold's failed to establish that Dillard violated the Oklahoma Antitrust Act; and (3) Harold's did not demonstrate that Dillard violated the Oklahoma Unfair Sales Act.

We review the district court's denial of a renewal motion for judgment as a matter

---

[9]     Because deficiencies in the survey bear on the weight and not the admissibility of the evidence, Brunswick, 832 F.2d at 523, we reject Dillard's contentions that technical or methodological defects in the survey rendered it inadmissible. Specifically, we reject Dillard's arguments that: (1) question four on the survey--the "filter" question--rendered the survey inadmissible; (2) the survey was fatally flawed because it did not mimic market conditions; (3) the survey was inadmissible because it did not refer to the copyrighted fabric designs; and (4) the survey questions were slanted, leading, and ambiguous.

23

of law de novo, applying the same standards as the district court. Lyon Dev. Co. v. Business Men's Assurance Co. of America, 76 F.3d 1118, 1122 (10th Cir. 1996). We must affirm if, viewing the record in the light most favorable to Harold's, there is evidence upon which the jury could properly return a verdict for Harold's. SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 962 (10th Cir. 1994), cert. denied sub nom., 115 S. Ct. 2600 (1995). We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury. Magnum Foods, Inc., v. Continental Casualty Co., 36 F.3d 1491, 1503 (10th Cir. 1994). However, we must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law." Fed. R. Civ. P. 50(a); see also SCFC ILC, Inc., 36 F.3d at 962. With these principles in mind, we examine Dillard's contentions in turn.

A.

Dillard first maintains the district court erred in denying its Rule 50(b) renewal motion for judgment as a matter of law because the evidence was insufficient to support the copyright damages award. Dillard contends that the survey evidence attested to by Dr. Howard did not provide reliable evidence of present or future reduced sales revenue as a result of reduced purchase intentions.

We first note that Ms. Casey, CEO of Harold's, testified without objection that Dillard's infringement of Harold's copyrighted print skirts damaged Harold's goodwill.

24

Ms. Casey estimated that Dillard's copyright infringement injured Harold's goodwill in the range of $225,000.00 to $500,000.00. Aplt. App. at 1748. A corporate officer familiar with company history, financial statements, and customer relations may offer opinion testimony as to the extent the company sustains damages to its goodwill. Rainbow Travel Serv. v. Hilton Hotels Corp., 896 F.2d 1233, 1239 (10th Cir. 1990) (rejecting sufficiency of the evidence challenge to jury verdict of $37,500.00 in damages to goodwill where company president had testified that company suffered injury to goodwill in the amount of $250,000.00).

Harold's offered opinion testimony from Dr. Howard in support of its copyright infringement damages claims. Dr. Howard based his damages estimates on the survey. Of the universe of undergraduate women who had visited a Dillard store in 1993, (when Dillard offered the infringing skirts for sale), and visited a Harold's store or looked at a Harold's catalog in 1991 or 1992, Dr. Howard testified that the survey detected a reduced future purchase intention by respondents who saw print skirts at Dillard that they thought were unique to Harold's. Specifically, Dr. Howard testified that women who saw the infringing skirts at Dillard were somewhat unlikely to purchase clothes from Harold's within the next year. Aplt. App. at 1976-77. In contrast, women who visited both stores but did not see skirts they thought of as unique to Harold's were, on the whole, fairly likely to shop at Harold's in the future. Dr. Howard reported that the women who saw the garments at issue at Dillard were 33.1% less likely to purchase garments at Harold's than

25

women who visited both stores at the relevant time but did not view the infringing skirts. Id. at 1977-78.

Dr. Howard analyzed the survey data and estimated the damages Harold's suffered nationwide from Dillard's copyright infringement. Dr. Howard testified that Harold's suffered damages to goodwill, reputation, and sales to future and prospective customers in the range of $226,367.00 to $517,809.00. Aplee. Supp. App. at 2491; Aplt. App. at 1988-99.

Based on this evidence, the jury awarded Harold's and CMT actual damages of $312,000.00 on the copyright infringement claim.[10] Viewing the evidence in the light most favorable to Harold's and drawing all reasonable inferences therefrom, SCFC ILC, Inc., 36 F.3d at 962, we conclude there was substantial evidence tending to support the jury's damages award on Harold's copyright infringement claim.

### B.

Dillard next contends the district court erred in denying its Rule 50(b) renewal motion for judgment as a matter of law on Harold's Oklahoma Antitrust Act claim. Dillard asserts it was entitled to judgment as a matter of law on the state antitrust claim because: (1) Harold's failed to prove Dillard unreasonably restrained trade; (2) the Oklahoma Antitrust Act requires proof of concerted action, not unilateral conduct; and (3)

---

[10] The district court later reduced the copyright damages to $260,220.00 to eliminate double recovery.

there evidence was insufficient to support the damages award.[11]

1.

Dillard argues that Harold's failed to prove that Dillard unreasonably restrained trade. At trial, Harold's contended that Dillard violated the Oklahoma Antitrust Act, Okla. Stat. tit. 79, § 1, by infringing Harold's garments in violation of the Copyright Act, and offering the infringing garments for sale below cost in violation of the Oklahoma Unfair Sales Act. On appeal, Dillard contends that Harold's did not show injury to competition in general--as required for an antitrust violation--but merely established that Dillard injured Harold's individually. Consequently, Dillard asserts the district court should have entered judgment as a matter of law in its favor on the state antitrust claim.

---

[11] Dillard also argues the district court erred in denying its Rule 50(b) motion on the state antitrust claim because Harold's failed to establish proof of a relevant market. Aplt. Br. at 36. We do not address this issue because Dillard failed to raise it before the district court. Dillard filed a brief in support of its Rule 50(b) motion with the district court and argued that Harold's failed to establish "evidence of injury to competition or unreasonable restraint of trade within the state of Oklahoma." Aplt. App. at 1181. Dillard did not argue that the district court erred in submitting the antitrust claim to the jury because Harold's failed to establish a relevant market. Instead, Dillard noted that its economist, Dr. Huettner, and Harold's economist, Dr. Murry, "differed as to the number of competitors to be included in each of these markets" but "agreed that the relevant geographic markets were the Oklahoma City and Tulsa areas." Id. at 1182. Dillard argued that "even accepting Murry's narrow submarket, there is no evidence to support injury from competition." Id. at 1183. Because Dillard failed to present this issue to the district court, we do not consider it on appeal. Mick v. Brewer, 76 F.3d 1127, 1132 n.2 (10th Cir. 1996).

The Oklahoma Antitrust Act provides:

**§ 1.  Trust in restraint of trade illegal**
Every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.

Okla. Stat. tit. 79, § 1.  In interpreting the Oklahoma Antitrust Act, the Oklahoma Supreme Court observed,

It has long been recognized that every agreement concerning trade, and every regulation of trade, restrains trade to some extent, and that the very essence of such agreements is to bind or restrain.  As a literal application of the provisions of 15 U.S.C., § 1, or [Okla. Stat. tit. 79, § 1] would outlaw every conceivable contract or combination which could be made concerning trade or commerce, courts have read into such statute a "rule of reason," under which only those acts, contracts, agreements, or combinations which prejudice public interest by unduly restricting competition, or unduly obstructing the due course of trade, or which injuriously restrain trade, are unlawful.

Teleco, Inc. v. Ford Indus., Inc., 587 P.2d 1360, 1362-63 (Okla. 1978); see also Crown Paint Co., 640 P.2d at 950.  In sum, only "unreasonable restraint of trade, as measured by the 'rule of reason'" violates Okla. Stat. tit. 79, § 1.  Teleco, Inc., at 1363.

"The fundamental test of the reasonableness of an action, which, by its nature, restrains trade, is its effect on the public." Kresbach v. Henley, 725 P.2d 852, 858 (Okla. 1986)  "'To amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon the plaintiff's business.'" Id. at  858 n.18 (quoting Gough v. Rossmoor Corp., 585 F.2d 381, 386 (9th Cir. 1978), cert. denied, 440

28

U.S. 936 (1979)). That is, "'[t]he conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged.'" Id. An antitrust plaintiff must show that the challenged conduct adversely impacts competition in general because "'the antitrust laws . . . were enacted for the protection of competition, not competitors.'" Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977)).

At trial, Dr. Murry, economics professor at University of Oklahoma, offered opinion testimony in support of Harold's state antitrust claim. Specifically, Dr. Murry testified that by infringing Harold's copyrights and selling garments below cost in violation of the Oklahoma Unfair Sales Act, Dillard not only injured Harold's, but harmed competition in general. Aplt. App. at 1847.

> I think there are two aspects of the impact on the potential competitors and the other competitors. On the one hand, if Dillard's can bypass the development costs of creating unique fabrics of their own, they can make it harder for anyone else to compete. And in economics, we call that a barrier to entry. Even if someone is in it, it means that it's going to make it more difficult for them to compete fairly and develop their own products, because that product cost has been bypassed. . . . And then secondly, if a company, such as Dillard's in this case . . . can essentially take the intellectual property of another company, or take the copyrights . . . it doesn't just do damage to Harold's, it sends a signal to anybody else that wants to enter this market, that if you come in here, you're going to get squashed because this big company will exercise its power and take your copyrights. In that regard, in economics, we would say it raises a barrier to entry. That itself is anti-competitive. That, in my judgment, is an unreasonable restraint of trade.

Aplt. App. at 1847-48 (emphasis added). Dr. Murry, therefore, presented opinion

testimony to the effect that Dillard's actions adversely impacted competition in general and unreasonably restrained trade. Viewing Dr. Murry's testimony in the light most favorable to Harold's as we must, SCFC ILC, Inc., 36 F.3d at 962, we conclude there was evidence upon which a jury could properly find that Dillard's actions unreasonably restrained trade by adversely impacting competition in general under the rule of reason analysis. Thus, we reject Dillard's argument that the district court should have entered judgment as a matter of law in favor of Dillard on the state antitrust claim because Harold's did not show that Dillard injured competition in general.

2.

Dillard also contends it was entitled to judgment as a matter of law on Harold's Oklahoma Antitrust Act claim because Okla. Stat. tit. 79, § 1, requires proof of concerted action, not unilateral conduct. Because Harold's argued at trial that Dillard's unilateral acts of copyright infringement and sales below cost unreasonably restrained trade--without attempting to show Dillard acted in concert with others--Dillard contends the district court should have entered judgment as a matter of law in its favor.

To date, the Oklahoma Supreme Court has not addressed whether § 1 of the Oklahoma Antitrust Act prohibits unilateral acts in restraint of trade. Thus, our duty is to determine, as best we can, how the Oklahoma Supreme Court would resolve this issue. E.g., Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). We review the district court's rulings on issues of state law de novo. Id.

30

Dillard's argument requires us to interpret Okla. Stat. tit. 79, § 1 using tools of statutory interpretation. In Oklahoma, "[t]he fundamental rule of statutory construction is to discern the Legislative intent." Cox v. Dawson, 911 P.2d 272, 276 (Okla. 1996). To ascertain legislative intent, Oklahoma courts examine the language of the pertinent statute. Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City, 901 P.2d 800, 803 (Okla.), cert. denied, 116 S. Ct. 674 (1995). The Oklahoma Statutes mandate that "[w]ords used in any statute are to be understood in their ordinary sense, except when a contrary intention plainly appears." Okla. Stat. tit. 25, § 1. Thus, Oklahoma courts "presume that the Legislature intends what it expresses" in the plain language of a statute. Oklahoma Ass'n for Equitable Taxation, 901 P.2d at 803.

Applying these governing principles of Oklahoma statutory interpretation to § 1 of the Oklahoma Antitrust Act, we conclude that the Oklahoma Legislature intended Okla. Stat. tit. 79, § 1 to reach unilateral conduct. The plain language of the statute provides "[e]very act . . . in restraint of trade . . . is hereby declared to be against public policy and illegal." Okla. Stat. tit. 79, § 1. The ordinary meaning of the word act "[d]enotes external manifestation of actor's will . . . something done voluntarily by a person." Black's Law Dictionary 17 (6th ed. 1991) (emphasis added). An actor is "[o]ne who acts." Id. at 22 (emphasis added). The plain language of the word "act" therefore encompasses unilateral conduct by a single entity.

Dillard argues, however, that Oklahoma courts have uniformly followed federal

31

decisions construing § 1 of the Sherman Act in interpreting § 1 of the Oklahoma Antitrust Act. Consequently, Dillard asserts that § 1 of the Oklahoma Antitrust Act--like § 1 of the Sherman Act--does not reach unilateral conduct.

The Oklahoma Antitrust Act is "similar to federal antitrust legislation," Oakridge Invs., Inc. v. Southern Energy Homes, Inc., 719 P.2d 848, 850 (Okla. 1986); see also Young v. Seaway Pipeline, Inc., 576 P.2d 1148, 1150 (Okla. 1977) ("Oklahoma [antitrust] statutes are patterned after the federal enactments being at times both cumulative and complimentary to federal legislation."). Oklahoma courts thus look to the interpretation § 1 of the Sherman Act, 15 U.S.C. § 1, by federal courts for "valuable assistance in interpreting the provisions of the Oklahoma statutes." Teleco, Inc., 587 P.2d at 1362.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Because § 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade, the Supreme Court has ruled that "[i]t does not reach conduct that is 'wholly unilateral.'" Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984). Thus, a plaintiff proceeding under § 1 of the Sherman Act must prove an agreement between two or more persons to restrain trade, because § 1 does not reach unilateral conduct. Fisher v. City of Berkeley, Cal., 475 U.S. 260, 266 (1986); Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1545

32

(11th Cir. 1996).

Although Okla. Stat. tit. 79, § 1 is "similar to federal antitrust legislation," Oakridge Invs., Inc., 719 P.2d at 850, it is not identical to § 1 of the Sherman Act. Significantly, Okla. Stat. tit. 79, § 1 prohibits "[e]very act . . . in restraint of trade." Id. Section 1 of the Sherman Act does not prohibit "every act" in restraint of trade, but proscribes "[e]very contract, combination . . . or conspiracy in restraint of trade," 15 U.S.C. § 1, all words that denote agreement or concerted action between at least two entities. Simply put, it takes two to tango under § 1 of the Sherman Act, while the plain language of § 1 of the Oklahoma Antitrust Act reaches unilateral conduct in restraint of trade.

Because the Oklahoma antitrust legislation differs from the relevant federal statute on this key point, federal authority ruling that § 1 of the Sherman Act "does not reach conduct that is 'wholly unilateral,'" Copperweld Corp., 467 U.S. at 768, does not govern this particular issue of Oklahoma statutory law. The difference between the federal and state antitrust legislation prevents federal decisions from providing "valuable assistance in interpreting the provisions of the Oklahoma [antitrust] statutes." Teleco, Inc., 587 P.2d at 1362. Federal rulings premised on the plain language of § 1 of the Sherman Act are inapposite to the significance of language in the Oklahoma statute that is absent from the federal legislation.

In sum, we must presume that the Oklahoma Legislature intended the word "act"

33

in Okla. Stat. tit. 79, § 1 to carry its ordinary meaning of something done voluntarily by a person.  See Okla. Stat. tit. 25, § 1; Oklahoma Ass'n for Equitable Taxation, 901 P.2d at 803.  As a federal court, we will not second guess the Oklahoma Legislature's decision to draft its state antitrust act to reach unilateral conduct.  We therefore believe the Oklahoma Supreme Court would, applying the governing principles of statutory interpretation to the plain language of Okla. Stat. tit. 79, § 1, conclude that § 1 of the Oklahoma Antitrust Act prohibits unilateral conduct in restraint of trade.  Accordingly, we reject Dillard's contention that it was entitled to judgment as a matter of law on Harold's Oklahoma Antitrust Act claim because Okla. Stat. tit. 79, § 1, requires proof of concerted action, not unilateral conduct.

3.

Dillard next argues the district court erred in denying its motion for judgment as a matter of law because the evidence was insufficient to support the damages award on the state antitrust claim.  Dillard argues that Harold's failed to provide any probative factual evidence that Harold's sustained monetary damages from an antitrust injury.

Viewing the record in the light most favorable to Harold's, we conclude substantial evidence reasonably tends to support the jury's damages award on Harold's Oklahoma Antitrust Act claim.  Relying on the results of the survey, Dr. Howard testified that Harold's customers in Oklahoma which saw the infringing skirts at Dillard were somewhat unlikely to purchase clothes at Harold's in the next year.  Using Harold's

34

Oklahoma sales figures, Dr. Howard calculated that the reduced purchase intention injured goodwill in the range of $51,675.00 to $146,595.00. Aplt. App. at 353-56. Based on this testimony, the jury awarded Harold's $30,000.00 on the state antitrust claim, which the district court later trebled to $90,000.00 pursuant to Okla. Stat. tit. 79, § 25. Because Dillard's infringement of Harold's print fabric skirts in Oklahoma supplied the predicate act for Harold's claim for an antitrust violation under Okla. Stat. tit. 79, § 1, we conclude that there was evidence to support the jury's damages award on the state antitrust claim.

C.

Finally, Dillard argues the district court erred in denying its Rule 50(b) renewal motion for judgment as a matter of law on Harold's Oklahoma Unfair Sales Act claim. Dillard asserts it was entitled to judgment as a matter of law on Harold's Unfair Sales Act claim because: (1) Dillard's price markdown was exempt as a bona fide clearance sale, and (2) the evidence was insufficient to support the damages award.

1.

Dillard argues that its markdown of the print skirts did not violate the Unfair Sales Act because the markdown was exempt under the Act as a bona fide clearance sale. We disagree.

Dillard initially priced the infringing skirts at $28.00 to $30.00 each. Harold's sold skirts featuring the same print fabrics for $78.00 to $80.00 the year before. On July 8,

35

1993 Harold's filed its complaint alleging that Dillard had infringed its copyrights. On July 21, 1993 Dillard reduced the price of the skirts from $28.00 or $30.00 to $12.00 or $12.25, a 59% mark down that set Dillard's price below cost.[12] Dillard advertised the mark down in newspapers as "Dillard's Summer Savings." Aplee. Supp. App. at 2436. At trial, Harold's argued that Dillard's below-cost sales in Oklahoma violated the Oklahoma Unfair Sales Act, Okla. Stat. tit. 15, § 598.3.

The Oklahoma Unfair Sales Act defines and prohibits "below-cost sales by retailers and wholesalers." So-Lo Oil Co. v. Total Petroleum, Inc., 832 P.2d 14, 17 (Okla. 1992); see Okla. Stat. tit. 15, § 598.3.[13] The Unfair Sales Act's "two major purposes are (1) to prevent 'loss leader selling' (featured items priced below cost to entice customers

---

[12]    Dillard stipulated that it offered the skirts for sale in Oklahoma at prices that were less than cost as defined by the Unfair Sales Act, Okla. Stat. tit. 15, § 598.2(a). Aplt. App. at 1082.

[13]    Section 598.3 of the Unfair Sales Act provides:

**§ 598.3.  Sales below cost prohibited in certain cases**
        It is hereby declared that any advertising, offer to sell, or sale of any merchandise, either by retailers or wholesalers, at less than cost as defined in this act with the intent and purpose of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor, impair and prevent fair competition, injure public welfare, are unfair competition and contrary to public policy and the policy of this act, where the result of such advertising, offer or sale is to tend to deceive any purchaser or prospective purchaser, or to substantially lessen competition, or to unreasonably restrain trade, or to tend to create a monopoly in any line of commerce.

Okla. Stat. tit. 15, § 598.3.

into a store where other merchandise prices are inflated) and (2) to protect small merchants from large competitors capable of driving them out of business by below-cost sales." So-Lo Oil Co., 832 P.2d at 17. Section 598.6(a) exempts clearance sales from the Unfair Sales Act. Okla. Stat. tit. 15, § 598.6(a). Section 598.6(a) provides: "[t]he provisions of this act shall not apply to sales at retail . . . where seasonable merchandise is sold in bona fide clearance sales, if advertised, marked, and sold as such." Id. (emphasis added). The Unfair Sales Act, including the exemptions, must be strictly construed. So-Lo Oil Co., 832 P.2d at 18.

Applying these principles to the instant case, we conclude that Dillard failed to demonstrate that the below-cost sales were exempted from the Unfair Sales Act. The exemption applies where a retail merchant sells seasonable merchandise in a "bona fide clearance sale[], if advertised, marked, and sold as such." Okla. Stat. tit. 15, § 598.6(a) (emphasis added). Dillard did not advertise the below-cost sales as a clearance sale as required by the statutory exemption. Instead, Dillard advertised the 59% mark down of the infringing garments as "Dillard's Summer Savings." Aplee. Supp. App. at 2436. The record also reveals that Dillard conducted three clearance sales prior to or after the "Dillard's Summer Savings" sale but did not include the skirts at issue among the items marked down for clearance. Id. at 2434-37. In sum, because Dillard neither advertised the 59% mark down of the skirts as a clearance sale nor sold the garments during a clearance sale, the plain language of § 598.6(a) does not exempt the below-cost sales

37

from the Oklahoma Unfair Sales Act. We therefore reject Dillard's argument that the district court erred in denying its Rule 50(b) motion on Harold's Oklahoma Unfair Sales Act claim because the below-cost skirt sales constituted an exempt bona fide clearance sale.

2.

Dillard argues that there was "a total lack of any competent evidence that Harold's suffered any damages due to Dillard's sale of infringing garments below cost in Oklahoma." We disagree.

At trial, Ms. Casey testified that Harold's was damaged by Dillard's sales below costs. Specifically, Ms. Casey observed that Dillard's display and sale of print fabric skirts at $12.00 to $12.25 that Harold's had sold for $78.00 to $80.00 made "us look like we've been cheating our customer all this time." Aplt. App. at 1743. Ms. Casey testified that the below-cost sales injured Harold's reputation and goodwill because it gave "the general impression that everything in [our] store is priced unfairly." Id.

In accordance with Ms. Casey's testimony, Dr. Howard offered opinion testimony that Dillard's sale of the infringing garments below cost breached the trust between Harold's and its customers:

> Simply the act of observing those skirts for sale at Dillard's reduced the
> likelihood that they're going to shop at Harold's in the future. . . . Harold's
> basic marketing position is that you can find unique skirts here. You can
> find things here that you're not going to find anywhere else. And then you

have a customer or potential customer who goes to Dillard's and sees precisely the same thing available for one-half to one-fourth the price, and <u>I believe that the customer and the potential customer would feel betrayed, if not even ripped off</u>.

Aplt. App. at 1979-80 (emphasis added). The jury returned a verdict of $21,780.00 in favor of Harold's on the Oklahoma Unfair Sales Act claim. Viewing the record in the light most favorable to Harold's, we conclude sufficient evidence supports the jury's verdict in favor of Harold's on its Unfair Sales Act claim.

## VI.

On cross-appeal, Harold's argues the district court erred by: (1) failing to award Harold's sufficient attorneys' fees on its Oklahoma Antitrust Act claim; (2) refusing to award Harold's attorneys' fees and expenses incurred under Fed. R. Civ. P. 37 in proving that William Dillard made certain statements reported in a newspaper that Dillard denied in discovery; and (3) denying Harold's motion for a permanent injunction. We address Harold's contentions in turn.

## A.

Harold's first contends the district court erred in failing to award it sufficient attorneys' fees on its Oklahoma Antitrust Act claim. Specifically, Harold's argues the district court abused its discretion in awarding it only $30,000.00 in attorneys' fees when Harold's requested $277,173.22, and erred as a matter of law by failing to calculate the fee award on an hour times rate basis.

Section 25 of the Oklahoma Antitrust Act provides that a party who prevails on an

39

antitrust claim "shall recover . . . a reasonable attorney's fee to be fixed by the court."

Okla. Stat. tit. 79, § 25. An attorneys' fee applicant bears the burden of proving that the

time and labor for which he seeks compensation are reasonable and that they relate to a

claim for which fees are recoverable. See Oliver's Sports Ctr. v. National Standard Ins.

Co., 615 P.2d 291, 295 (Okla. 1980); State ex rel. Burk v. City of Oklahoma City, 598

P.2d 659, 663 (Okla. 1979). To calculate reasonable attorneys' fees, the district court

should "first determine hourly compensation by multiplying hours times rate" and then

add to that an amount based on enumerated factors. Southwestern Bell Tel. Co. v. Parker

Pest Control, Inc., 737 P.2d 1186, 1188 (Okla. 1987). The factors are set forth in the

margin.[14] However, in its discretion and based upon the circumstances of a particular

case, "the trial court may consider factors other than reasonable hours multiplied by a

---

[14]    The factors to consider in estimating a reasonable attorneys' fee are:
1.    Time and labor required.
2.    The novelty and difficulty of the questions.
3.    The skill requisite to perform the legal service properly.
4.    The preclusion of other employment by the attorney due to acceptance of the case.
5.    The customary fee.
6.    Whether the fee is fixed or contingent.
7.    Time limitations imposed by the client or the circumstances.
8.    The amount involved and the results obtained.
9.    The experience, reputation and ability of the attorneys.
10.    The 'undesirability' of the case.
11.    The nature and length of the professional relationship with the client.
12.    Awards in similar cases.
Southwestern Bell Tel. Co., 737 P.2d at 1188; see also Okla. Stat. tit. 5, App. 3-A, Rule 1.5.

40

reasonable rate in determining a reasonable attorney fee." Arkoma Gas Co. v. Otis Eng'g Corp., 849 P.2d 392, 394 (Okla. 1993); see also Southwestern Bell Tel. Co., 737 P.2d at 1189 (Oklahoma Supreme Court has not "rejected the notion that an attorneys' fee must bear some reasonable relationship to the amount in controversy. It does, and that relationship must be considered in each case where an attorneys' fee is awarded."). We review the district court's award of attorneys' fees for an abuse of discretion, but review legal conclusions that provide a basis for the award de novo. Tulsa Litho Co. v. Tile and Decorative Surfaces Magazine Publishing, Inc., 69 F.3d 1041, 1043 (10th Cir. 1995); Arkoma Gas Co., 849 P.2d at 394.

Turning to the facts of the instant case, Harold's concedes it is not eligible for attorneys' fees on either the copyright infringement claim, see 17 U.S.C. § 412, or the Oklahoma Unfair Sales Act claim. However, because the state antitrust violation was premised on copyright infringement and sales below cost violations, Harold's maintains it is entitled to attorneys' fees under the Oklahoma Antitrust Act for the time expended proving copyright infringement and the Unfair Sales Act violations. Harold's filed an application for attorneys' fees with the district court, seeking $277,173.22.

The district court stated that Harold's "burden necessarily includes providing the Court with a reasonable basis for allocating fees" between the compensable antitrust claim and the non-compensable copyright and Unfair Sales Act claims. The district court concluded that it was impossible to determine the amount of time Harold's expended on

the state antitrust claim and the non-compensable claims.  Consequently, the district court

awarded Harold's $30,000.00, one-third of the $90,000.00 recovered on the Oklahoma

Antitrust Act claim.

Based on the circumstances of this case, we cannot conclude the district court

abused its discretion in awarding Harold's $30,000.00 in attorneys' fees on the state

antitrust claim.  The district court considered the factors outlined in Southwestern Bell

Tel. Co., 737 P.2d at 1188, and concluded that it was reasonable and appropriate to fix

"the attorneys' fees based upon a percentage of Harold's recovery on the antitrust claim."

Specifically, the district court ruled:

> In light of the relatively minor role the antitrust claim played in the trial and pretrial proceedings, and the fact that the recovery under the Copyright Act was more than three times the total recovery under the antitrust claim, it would clearly be inequitable to allow Plaintiff's counsel to "piggy back" large portions of the copyright-related fees onto the antitrust claim.  Since the statute governing the. . . [copyright] claim expressly precludes an award of attorney's fees . . . any award of attorney's fees for the antitrust claim should be proportionate to the value of that claim.  Moreover, both the overlapping nature of the claims and counsel's "block billing" method make it impossible to allocate specific increments of time to each claim.[15]

 The Oklahoma Supreme Court has ruled that "the trial court may consider factors other

than reasonable hours multiplied by a reasonable rate in determining a reasonable attorney

fee," Arkoma Gas Co., 849 P.2d at 394, including the relationship of the fee requested to

---

[15]     "Block billing" refers to the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.

the overall value of the claim in determining the reasonableness of a fee award.  See

Southwestern Bell Tel. Co., 737 P.2d at 1189.  We therefore reject Harold's argument

that the district court erred as a matter of law when it did not calculate hourly

compensation on an hour times rate basis.

B.

Next, Harold's contends the district court erred in failing to award it attorneys'

fees and expenses incurred under Fed. R. Civ. P. 37 in proving that Mr. William Dillard,

founder, chairman, and chief executive officer of Defendant Dillard, Inc., made a

statement reported in a newspaper that Dillard denied in discovery.  In 1993, the Dallas

Morning News reported that Mr. Dillard stated at a shareholder meeting, "We're going to

add more private labeling by attempting to buy merchandise from the same sources the

so-called U.S. manufacturers buy from and not pay them a big profit for it."  Maria

Halkias, Dillard's Shifting Merchandising Strategy, Dallas Morning News, May 17, 1993,

at 1D.  In its response to Harold's request for admissions, Dillard denied that Mr. Dillard

had any recollection of making the statement.  Harold's expended considerable effort

attempting to verify that Mr. Dillard made the statement, and eventually deposed Maria

Halkias, the newspaper journalist who attributed the statement to Mr. Dillard.  Ms.

Halkias testified in her deposition that Mr. Dillard made the statement reported in the

article.  Harold's never deposed Mr. Dillard, although the district court rejected Dillard's

motion for a protective order.  At trial, Mr. Dillard testified that he made the statement at

43

issue.

Harold's moved for sanctions under Fed. R. Civ. P. 37(c)(2). The district court denied Harold's Rule 37(c)(2) motion, finding that Dillard's failure to admit that Mr. Dillard made the statement was in good faith and for good reason, and was thereby not subject to sanctions. Specifically, the court observed that Dillard "was first asked to admit that Mr. Dillard made the statements some four months after the statements were made. Further, the statements were made during Mr. Dillard's informal, extemporaneous remarks at the annual shareholder's meeting at which no verbatim record was made." On appeal, Harold's asserts that it is entitled to reasonable expenses incurred in proving that Mr. Dillard made the statement attributed to him in the newspaper article because Dillard failed to admit that Mr. Dillard made the statement.

Rule 37(c)(2) provides that a party who denies a request for admission may be liable for expenses, including attorneys' fees, incurred by the other party in later proving the truth of the matter. Fed. R. Civ. P. 37(c)(2). Rule 37(c)(2) provides in relevant part:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves . . . the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (A) the request was held objectionable pursuant to Rule 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (D) there was other good reason for the failure to admit.

Fed. R. Civ. P. 37(c)(2) (emphasis added). The Rule mandates an award of expenses

44

unless the court finds that an exception applies. Id.; Marchand v. Mercy Med. Ctr., 22 F.3d 933, 936 (9th Cir. 1994). We review the district court's determination whether a party is entitled to expenses under Rule 37(c)(2) for an abuse of discretion. Marchand, 22 F.3d at 936.

In the instant case, the district court concluded that Dillard failed to admit that Mr. Dillard made the statement in good faith and for good reason, an exception to the Rule. See Fed. R. Civ. P. 37(c)(2)(D) ("The court shall make the order unless it finds that . . . there was other good reason for the failure to admit."). Based on the factors listed by the district court, we do not believe the district court abused its discretion in concluding that Dillard had good reasons for failing to admit that Mr. Dillard made the statement attributed to him by the Dallas Morning News. Thus, we reject Harold's argument that the district court erred by denying its request for fees under Rule 37(c)(2).

## C.

Finally, Harold's contends the district court erred by refusing to permanently enjoin Dillard from infringing Harold's existing and future fabric copyrights. Harold's argues that because Dillard infringed Harold's copyrighted print fabric designs for commercial gain and sold the skirts after Harold's filed the complaint, the district court was required to permanently enjoin Dillard from infringing Harold's existing and future copyrights.

Section 502(a) of the Copyright Act authorizes a court to issue a permanent

45

injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A copyright holder that establishes past infringement and a substantial likelihood of infringement in the future is normally entitled to a permanent injunction against the infringer pursuant to § 502(a). Walt Disney Co. v. Powell, 897 F.2d 565, 567 (D.C. Cir. 1990); Pacific and So. Co., Inc. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984), cert. denied, 471 U.S. 1004 (1985); 3 Melville B. Nimmer & David Nimmer, Nimmer On Copyright § 14.06[B], at 14-98 (1995) ("[A] showing of past infringement and a substantial likelihood of future infringement justifies issuance of a permanent injunction.") (quotation omitted). When there is no probability or threat of continuing infringements, injunctive relief is ordinarily inappropriate. Nimmer & Nimmer, § 14.06[B], at 14-97 to 14-98. We review the district court's issuance or denial of a permanent injunction for an abuse of discretion. Securities and Exch. Comm'n v. Pros Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993). Under this standard, we accept the district court's factual findings unless they are clearly erroneous and review application of legal principles de novo. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 939 (4th Cir. 1995).

Applying these principles to the instant case, we reject Harold's argument that it is entitled to a permanent injunction because Dillard infringed Harold's copyrights for commercial gain and sold the skirts after Harold's filed the complaint. The record establishes that Dillard and Harold's have disposed of all the infringing skirts in Dillard's

46

possession pursuant to an agreement between the parties. Thus, no probability exists that Dillard will continue to infringe Harold's existing copyrighted fabric designs. Further, Harold's has not demonstrated a substantial likelihood that Dillard will infringe Harold's future copyrighted fabric designs. Because Harold's has failed to demonstrate a threat of continuing infringement, it is not entitled to a permanent injunction under § 502(a) of the Copyright Act. See Walt Disney Co., 897 F.2d at 567; Nimmer & Nimmer, § 14.06[B], at 14-97 to 14-98. We therefore conclude the district court did not abuse its discretion in denying Harold's request for a permanent injunction.

## VII.

In sum, we hold the district court did not err by: (1) concluding that the Copyright Act did not preempt Harold's claim under the Oklahoma Antitrust Act; (2) admitting Dr. Howard's survey; and (3) denying Dillard's renewal motion for judgment as a matter of law after trial. We also conclude the district court did not abuse its discretion by refusing to award Harold's additional attorneys' fees and by denying Harold's request for a permanent injunction.

AFFIRMED.